UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  4:14CR104 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION AND ORDER |
| | ) | |
| DARRYL L. LEE, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court is the suppression motion of defendant Darryl Lee, which challenges the January 30, 2014 search of defendant's private residence located in Youngstown, Ohio.[1] (Doc. No. 16.) The government opposes the motion (Doc. No. 18), and defendant has filed a reply. (Doc. No. 19.) The Court conducted an evidentiary hearing on the motion on June 5, 2014. At the conclusion of the hearing, the Court took the matter under advisement.

I.  BACKGROUND

The parties agree as to the sequence of events leading up to the January 30, 2014 search. In April, 2013, defendant was released from prison to a "therapeutic" facility in Pennsylvania designed to assist him in his re-integration into society. Prior to

---

[1] By this motion, defendant also challenged the admissibility of the statement he made to a federal agent present during the search, on the grounds that the statement was made in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). On June 6, 2014, the government filed a supplemental response to defendant's suppression motion, in which it represented that it would not seek to introduce, as part of its case-in-chief, defendant's statement made to the federal agent. (Doc. No. 20 at 95.) This portion of defendant's motion is, therefore, moot.

his release, defendant had served a term of imprisonment in a Pennsylvania state correctional institution for a conviction for aggravated assault with a firearm specification and a separate conviction on a weapons offense. Defendant's criminal history also included a 2008 arrest for having a weapon while under a disability, which resulted in a conviction in 2012, on the execution of a bench warrant, while defendant was already in custody in Pennsylvania. In August 2013, defendant was placed on parole in Pennsylvania. The terms of his Pennsylvania parole required him to obey all laws, as well as abstain from possession of any deadly weapons or illegal narcotics. Defendant was also subject to warrantless searches. (Doc. No. 18-2 at 75-78; Gov. Hearing Ex. 2.)

In September 2013, defendant's parole was transferred to Ohio because defendant intended to live in Youngstown, Ohio with his girlfriend, Joshulen Harrison. Ohio Adult Parole Authority Officer ("APAO") James Campana was assigned as his parole officer. APAO Campana met with defendant, on September 4, 2013, to discuss the conditions of his parole in Ohio. During this meeting, defendant signed a copy of the parole terms, indicating that he understood that he was subject to these terms. (Doc. No. 18-2 at 74; Gov. Hearing Ex. 1.) Relevant to the suppression motion, those terms provided, in part, that defendant would obey all federal, state, and local laws, and he would not purchase, own, or possess any weapons or illegal drugs. (*Id*.) The conditions of supervision also provided that defendant was "subject to warrantless searches." (*Id*.)

On December 21, 2013, defendant was arrested in Mahoning County, Ohio for felony possession of heroin and cocaine. Defendant promptly reported the arrest to APAO Campana, who, in turn, contacted the authorities in Pennsylvania to alert them of the arrest. APAO Campana issued defendant a written "unit sanction," which reminded

2

defendant to comply with all of the terms of his parole. APAO Campana also made arrangements for defendant to be evaluated for participation in a drug addiction treatment program.

As part of his supervision of defendant's parole, APAO Campana made several unannounced visits to defendant's residence. The purpose of each visit was to ensure that defendant was complying with the terms of his parole. The last visit occurred on January 28, 2014, two days before the search that is the subject of the present suppression motion. It is undisputed that the last visit was without incident, and that there was nothing about the visit, alone, that caused APAO Campana to suspect that defendant was not fully complying with the terms of his parole.

On January 29, 2014, Campana's fellow parole officer, Robert O'Malley, received a call from an off-duty Youngstown police officer who was providing private security for the apartment complex in which defendant resided. He reported to APAO O'Malley that the apartment complex management had received complaints from residents that weapons were being taken in and out of defendant's apartment. APAO O'Malley conveyed the information to APAO Campana, who immediately took the information to his supervisor. Given the fact that defendant had a history of weapons charges, and in light of defendant's recent drug arrest and the complaints from residents of defendant's apartment complex, APAO Campana advised his supervisor that he wished to take law enforcement officers to defendant's apartment to conduct a search of the premises.

On the morning of January 30, 2014, APAO Campana arrived at the apartment complex with APAO Dwight Pavkovich, accompanied by two Youngstown

3

police officers. APAO Campana testified that he knocked on the front door to defendant's apartment loudly for five minutes, but defendant failed to answer. After he unsuccessfully attempted to reach defendant by phone, APAO Campana placed a phone call to defendant's girlfriend, who lived with defendant in the apartment. She explained that she was not home but that defendant was home and was sleeping. She advised APAO Campana that she was on her way back to the apartment. When she arrived, she allowed the officers into the apartment. The officers found defendant in a bedroom, and escorted him to the living room where they handcuffed him and patted him down for officer safety. APAO Campana asked defendant if there was anything in the apartment that he shouldn't have. Defendant responded: "No, go ahead and look."

   The APAO officers proceeded to search the small apartment while the Youngstown police officers provided security by supervising defendant. The search yielded a large sum of U.S. currency that was found in a shoe box in defendant's bedroom. APAO officers also found a large sum of money in defendant's wallet, and stacks of money scattered throughout the bedroom. In total, officers located $8,880 in U.S. currency. In addition, officers found hypodermic needles and plastic baggies. Given the fact that the money, needles, and plastic baggies suggested possible drug activity, APAO Campana contacted his supervisor and a K-9 officer was dispatched to the scene. K-9 Officer Larry McLaughlin arrived with his dog and took the animal through the apartment. The dog "alerted on the currency," suggesting that the money was tainted with illicit substances. At this point, APAO Campana advised defendant that he was under arrest, and read him his *Miranda* rights. Defendant was asked if he understood his rights, and defendant responded in the affirmative.

After defendant was *Mirandized*, a more extensive search was conducted. Officers found a 9milimeter handgun and a nearby magazine. The weapon was loaded but did not have a round in the chamber. Officer McLaughlin contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) Special Agent Kevin Ireland. After S.A. Ireland arrived at the apartment, he led defendant to a back room, where he asked him if he knew anything about the firearm. Defendant initially denied any knowledge of the firearm, but then added that, "I'm probably going to have to do five," presumably referring to five years in prison. He then asked S. A. Ireland, "Are we done?" Defendant made no further statements to police.[2] Defendant was subsequently transported to the Youngstown Police Department where was booked into jail. He was indicted by a federal grand jury on one count of being a felon in possession of a firearm on March 27, 2014.

At the suppression hearing, APAO Campana testified that he relied upon the tip that defendant had weapons in his apartment, defendant's recent drug arrest, and his history of weapons-related offenses in deciding to proceed to defendant's apartment on January 30, 2014. He explained that he did not decide to search in December 2013, when he first learned about the drug arrest, because defendant had cooperated by reporting the arrest. He explained that he became concerned when he received the tip in January 2014, however, because the tip involved the potential unlawful possession of weapons and defendant had a history of weapons violations.

---

[2] As previously discussed, defendant's statements to Special Agent Ireland will not be introduced in the government's case-in-chief.

5

## II.  GOVERNING LAW AND DISCUSSION

It is undisputed that the search of defendant's apartment on January 30, 2014 took place without a warrant. The government insists that defendant gave knowing and voluntary consent to the warrantless search. In the alternative, the government argues that officers on the scene had reasonable suspicion to effectuate the search of a parolee's residence.

### A.  Consent to Search

It is the government's position that defendant consented to the search when, in response to APAO Campana's inquiry as to whether defendant had anything in his apartment that he should not have, defendant responded, "No. Go ahead and look." "When seeking to justify a search based on consent, the government has the burden of showing by a preponderance of the evidence that the consent was 'freely and voluntarily given,' and was not the result of coercion, duress, or submission to a claim of authority." *United States v. Bueno*, 21 F.3d 120, 126 (6th Cir. 1994) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968)); *see also United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996) ("A search may be conducted without a warrant if a person with a privacy interest in the item to be searched gives free and voluntary consent.") (citations omitted). The determination of whether consent was entered into freely and voluntarily is "a question of fact to be determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).

The fact that a defendant is handcuffed at the time consent is given does not necessarily compromise the voluntariness of the consent. In *United States v. Perry*,

6

703 F.3d 906 (6th Cir. 2013), officers, responding to reports that defendant had pointed a revolver at residents of the boarding house where she also resided, approached defendant in the stairwell of the boarding house. With weapons drawn, the officers instructed the defendant to put her hands in the air, she complied and was immediately handcuffed. The officers then asked for Perry's consent to search her room, and she gave it. Following the discovery of a weapon, Perry was charged with being a felon in possession. In affirming her conviction, the Sixth Circuit ruled that the fact that defendant was handcuffed at the time consent was given did not render such consent involuntary, finding that the brief encounter was devoid of "repeated questioning or physical abuse." *Id*. at 909 (collecting Sixth Circuit cases finding that handcuffs did not render consent involuntary). The court also relied, in part, on the fact that the defendant was "no stranger to the criminal justice system," "since she had been arrested—and thus presumably handcuffed—at least 57 times before." *Id*. (citations and quotation marks omitted).

Similarly here, there was nothing about defendant's brief encounter with law enforcement on January 30, 2014 to call into question the voluntariness of his consent. There was no evidence that officers had their weapons drawn when they entered the apartment, and no physical altercation preceded defendant being placed in handcuffs. Nor was there evidence that officers yelled at defendant or subjected him to repeated questioning. In fact, APAO Campana testified that he had "very little" interaction with defendant, asking him the one question regarding whether he was in possession of anything that he should not have. Moreover, while defendant did not have quite as much experience as Perry with the criminal justice system, defendant's prior arrests in

7

Pennsylvania and Mahoning County, Ohio would suggest that he had previously found himself in handcuffs on multiple occasions prior to January 30, 2014.

At the hearing, defense counsel attempted to distinguish *Perry* on the grounds that the officers did not have a reasonable suspicion that would have justified their presence in the apartment at the time defendant allegedly gave his consent. "When an individual consents to a search after an illegal entry is made, the consent is not valid and suppression is required of any items seized during the search . . . , unless the taint of the initial entry has been dissipated before the 'consents' to search were given." *United States v. Chambers*, 395 F.3d 563, 569 (6th Cir. 2005) (citations and quotation marks omitted), *abrogated on other grounds by Kentucky v. King*, -- U.S. --, 131 S. Ct. 1849, 1857, 179 L. Ed. 2d 865 (2011).

Here, the Court need not concern itself with any taint from an illegal entry because the officers did not enter the apartment unlawfully. APAO Campana testified that, as part of his supervision of parolees, he makes routine, unannounced home visits. Defendant does not contest that APAO Campana was entitled to come to his apartment to ensure that he was meeting the conditions of his parole, and, indeed, APAO Campana testified that he went to defendant's apartment on January 30, 2014 to make sure that defendant was in compliance. There is no question, therefore, that the officers had a right to visit defendant's residence. Once there, it is uncontested that Ms. Harrison—the other resident of the apartment—permitted the officers to enter the residence. The prohibition against a warrantless entry into a person's home does not apply where voluntary consent has been obtained by someone who possessed common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990)

(citations omitted). Defendant does not contest Ms. Harrison's right, as a co-resident of the apartment, to permit the officers access to the apartment. Because there was no illegal entry, the consent could not have been tainted.

Defendant also argues that his consent was vitiated by the fact that the officers had intended to search the apartment with or without his consent. APAO Campana testified that he went to defendant's residence with the intent to search it. He candidly admitted that he would have proceeded with the search even if defendant had not given his consent. Crucially, however, there is no evidence that APAO Campana advised defendant that he intended to search the apartment regardless of whether defendant gave his consent. *Cf. United States v. Worley*, 193 F.3d 380, 386-87 (6th Cir. 1999) (defendant's consent to search was a mere recognition that officers had the right to search). When APAO asked defendant for consent to search, defendant voluntarily gave it, APAO Campana's unarticulated plan to search without notwithstanding.

B.     **Reasonable Suspicion to Search**

While the Court finds that defendant knowingly and voluntarily consented to the search, it also concludes that—even without defendant's consent—the search was constitutionally reasonable. *See generally Griffin v. Wisconsin*, 483 U.S. 868, 873, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987) ("A probationer's home, like anyone else's, is protected by the Fourth Amendment's requirement that searches be 'reasonable.'") The parties agree that *United States v. Knights*, 534 U.S. 112, 122 S. Ct. 587, 151 L. E. 2d 497 (2001), supplies the framework for evaluating the officers' justification to search. In *Knights*, the Court observed that, "[i]nherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." *Id*. at

9

119 (citation and quotation marks omitted). Because a court granting probation may "impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens[,]" such as the requirement that the offender to submit to warrantless searches, the Court concluded that probationers have a diminished expectation of privacy. *Id*. This reduced expectation of privacy, balanced against the government's heightened interest in ensuring that probationers do not repeat their criminal actions, "warrant[s] a lesser than probable-cause standard" for justifying the search of a probationer's residence. *Id*. at 121. The Court articulated the applicable standard as such:

> When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.

*Id*.[3]

Reasonable suspicion "requires more than a 'mere hunch,' but is satisfied by the likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (citation and quotation marks omitted). It is not necessary that there be reasonable suspicion that a parolee is violating the law but only that he is violating the terms of his parole. *United States v. Herndon*, 501 F.3d 683, 689 (6th Cir. 2007). In applying this standard, the Court is to employ the "general Fourth Amendment approach of examining the totality of the circumstances" applicable to the consideration

---

[3] In *Samson v. California*, 547 U.S. 843, 850, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006), the Supreme Court observed that "parolees have fewer expectations of privacy that probationers, because parole is more akin to imprisonment than probation is to imprisonment." The Court in *Samson* held that even a suspicion-less search of a parolee did not violate the Fourth Amendment. *Id*. at 846. For purposes of defendant's motion to suppress, however, this Court assumes that a valid search would have to be supported by consent or reasonable suspicion.

of reasonableness of all government intrusions. *Knights*, 534 U.S. at 118 (citation and quotation marks omitted); *see, e.g., Samson v. California*, 547 U.S. 843, 848, 126 S. Ct. 2193, 165 L. Ed. 2d 250 (2006) (applying "totality of the circumstances" standard to search of parolee) (citation and quotation marks omitted); *see also United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981) (reasonable suspicion standard takes into account "the totality of the circumstances—the whole picture"); *Smoak*, 460 F.3d at 779 (In examining the totality of the circumstances, reasonable suspicion "need not arise from an officer's direct observation, but can be based on informant tips and dispatcher information.")

Applying the totality of the circumstances approach, the Court finds that there was reasonable suspicion to search defendant's residence. In deciding to search the apartment, APAO Campana testified that he relied on three things: (1) the tip, conveyed to him by APAO O'Malley from an off-duty police officer working at defendant's apartment complex, that weapons had been seen in defendant's residence; (2) that defendant had recently been arrested on drug charges; and (3) that defendant had a history of weapons-related offenses. Defendant attempts to attack each item separately, and, in fact, each item—standing alone—may be insufficient to establish reasonable suspicion. For example, it is true, as defendant has argued, that a person's "'criminal record *alone* does not justify a search of his or her home[.]'" (Doc. No. 19 at 87 [quoting *United States v. Payne*, 181 F.3d 781, 790-91 (6th Cir. 1999) (emphasis added)].) However, the totality of the circumstances approach precludes the Court from considering each attendant circumstance in a vacuum. When these facts are considered

11

together, it is clear that APAO Campana had reason to suspect that defendant was—at the very least—in violation of the parole condition that he not possess weapons.

With respect to the tip, defendant observes that, "[m]ultiple federal cases have found a tip insufficient to establish reasonable suspicion for a warrantless search of a probationer's home." (Doc. No. 19 at 83 [collecting cases].) Notwithstanding these rulings, courts have also found that anonymous tips have their place in law enforcement. The Supreme Court recently discussed the use of such tips in support of warrantless searches in *Navarette v. California*, -- U.S. --, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014). There, the Court held that, "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion . . . .'" *Id.* at 1688 (quoting *Alabama v. White*, 496 U.S. 325, 327, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)).

The tip in question had certain indicia of reliability. APAO Campana testified that he credited the tip because it was conveyed by a trained Youngstown police officer, with whom APAO O'Malley had prior relationship. The police officer, in turn, found the tip sufficiently credible and reliable to prompt him to make further inquiries with the Adult Parole Authority. Further, the tip regarded a parolee that APAO Campana knew had a history of weapons-related offenses.[4] Finally, factored into the equation is the

---

[4] Contrary to defendant's suggestion, his weapons convictions were not "stale." Defendant was continuously incarcerated in Pennsylvania from the time he was arrested on the Ohio weapons charges until he was paroled in August, 2013, a matter of months before APAO Campana learned of the tip.

fact that the tip came on the heels of defendant's drug-related arrest.[5] The Sixth Circuit has repeatedly recognized the correlation between drug trafficking and weapons. *United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001) ("This Court has held many times that guns are 'tools of the trade' in drug transactions.") (quoting *United States v. Arnott*, 704 F.2d 322, 326 (6th Cir. 1983)); s*ee United States v. Till*, 434 F.3d 880, 893 (6th Cir. 2006) (holding that testimony of drug possession was relevant in proving that a discovered firearm was possessed by defendant, and collecting cases connecting drugs to the possession of firearms). Give the totality of these circumstances, it would have been reasonable for APAO Campana to suspect that defendant was engaging in criminal conduct involving weapons and drugs—criminal conduct that would have also violated his parole.

### III. CONCLUSION

For all of the foregoing reasons, defendant's motion to suppress the fruits of the January 30, 2014 search of his residence is denied.

**IT IS SO ORDERED**.

Dated: June 12, 2014

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[5] At the motion hearing, defense counsel argued that the drug arrest "had been dealt with," referring to the issuance of the "unit sanction." While APAO Campana testified that he originally believed that the "unit sanction" was the appropriate response to news that defendant had been arrested on drug charges, he testified that information regarding the tip elevated his concern about defendant's ability to comply with his parole conditions.